UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

=====

United States of America

v.

Mohammed W. Akram,

                              Defendant.

**Decision and Order
and
Report and Recommendation**

15-CR-113W

=====

## I.    INTRODUCTION

In the months prior to April 13, 2015, defendant Mohammed Akram ("Akram") met and communicated with a confidential informant about opportunities to make, to buy, and to sell synthetic cannabinoids.  Some of the meetings included samples of synthetic cannabinoids that Akram gave the informant, one time in exchange for money.  On April 13, 2015, Akram, who lives in Rochester, New York, agreed to meet the informant the next day in Buffalo to provide four gallons of materials containing synthetic cannabinoids.  On April 14, 2015, law enforcement agents watched Akram leave his building with a box and begin a route consistent with travel to Buffalo to meet the informant at the appointed time.  The agents intervened, arrested Akram, seized the box from the front passenger seat, and impounded Akram's vehicle.  The materials in the box field-tested positive for synthetic cannabinoids.  Law enforcement agents later that day searched Akram's business and apartment, which both were located in the same building.

Akram now faces charges related to possession and distribution of synthetic cannabinoids. District Judge Elizabeth Wolford has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 14.)  Akram filed omnibus pretrial motions on November 23, 2015.  (Dkt. No. 24.) Following suppression hearings on May 17 and June 9, 2016, and after considering all of the

parties' papers, the Court now issues this combined Decision and Order for Akram's non-dispositive motions and Report and Recommendation for Akram's dispositive suppression motions. The Court will address each motion separately below.

## II.   BACKGROUND

This case concerns allegations that Akram possessed and sold two Schedule I controlled substances that are considered synthetic cannabinoids: N-(1-amino-3-methyl-1-oxobutan-2-yl)-1-(4-fluorobenzyl)-1H-indazole-3-carboxamide, also known as AB-FUBINACA; and N-(1-amino-3-methyl-1-oxobutan-2-yl)-1-pentyl-1H-indazole-3-carboxamide, also known as AB-PINACA. Akram allegedly possessed synthetic cannabinoids at both his residential apartment and his business, "Best in the West." Akram's apartment and business both are located at 670 Jay Street in Rochester, New York. The business is located on the first floor, and Akram's apartment sits above the business. There appears to be at least one other apartment in the building, and that apartment is not relevant to the events of this case.

### A.  Investigation of Akram Prior to 2014

Akram first came to the attention of law enforcement in 2012. In 2012, the Drug Enforcement Administration ("DEA") was conducting Operation Logjam, an investigation into the distribution of synthetic cannabinoids. (Dkt. No. 40 at 6–7.) The investigation led to the arrest and conviction, by plea, of someone who had a business relationship with Akram. The person convicted became a confidential informant who helped law enforcement agents investigate Akram in 2014 and later. Law enforcement agents appear not to have directed their primary attention to Akram prior to 2014.

### B.  Investigation of Akram in 2014 and Later

In 2014, Akram came to the attention of DEA Special Agent Gregory Yensan ("Yensan") and other investigators again through a large cash transaction that the agents considered suspicious.  In the fall of 2014,

> Mr. Akram provided $100,000 to [a] DEA Rochester undercover agent.  And a result of that transaction, those offices being New York City, other offices within DEA, was looking to see hey, why was Mr. Akram provid[ing] a hundred thousand dollars to this undercover agent for money laundering purposes?  So, that stemmed into research being done on Mr. Akram, which indicated that in 2012 Mr. Akram and Mr.—and the CS had telephone contact.  So that's what made me reach out to the CS.

(Id. at 37.)  Yensan and other agents decided to take a closer look at Akram through a series of controlled purchases and through recorded communications between Akram and the confidential informant.

One communication occurred on November 11, 2014.  (Gov't Ex. 1.)  In this communication, Akram met with the informant to discuss possible business and shipping arrangements for so-called "new" product.  Akram inquired whether anyone still supplies "old" product, which Yensan interpreted to mean the synthetic cannabinoids investigated during Operation Logjam in 2012.  (Id. at 11–12.)  Nonetheless, the November 11, 2014 meeting did not by itself lead to any specific arrangements.

During two meetings with the informant on December 9, 2014 (Gov't Exs. 1G, 1H), Akram provided the informant with vaporizer samples that tested positive for AB-FUBINACA and AB-PINACA.  (Dkt. No. 40 at 15–16.)  No specific business deals were reached on December 9, 2014, though Akram did tell the informant his network of suppliers had national reach and could fulfill any order that the informant placed—5,000 vials, 10,000 vials, or any other quantity.  Akram

also asked the informant, "just between us," whether the informant knew anybody who could supply "old" product with a stronger flavor and effect "like back in the days."  Akram inquired because, in his experience, his white customers were satisfied with the current or "new" formulation but his black customers missed the stronger effect of the "old" product.  Akram told the informant that if a supplier of "old" product could be found than Akram would be interested in a one-time order of perhaps 100,000 units.

Akram met the informant again on January 22, 2015.  (Gov't Ex. 1C.)  The two had some conversation about figuring out a way to make their own product to eliminate middleman costs.  Akram provided the informant with a sample of 501 vials of a product that tested positive for AB-PINACA.  (Dkt. No. 40 at 19.)  Akram also reiterated his request, if possible, for a one-time purchase of "old" product that would allow him to "step it up a notch."

Another exchange between Akram and the informant occurred on March 17, 2015.  (Gov't Exs. 1C through 1F.)  On that day, the informant paid Akram $5,500 and received two one-gallon containers of vaporizer liquid that tested positive for AB-PINACA.  (Dkt. No. 40 at 20–21.)

While Akram maintained communications with the confidential informant, law enforcement agents made a number of undercover purchases at Akram's business.  Undercover agents made purchases on January 27, February 4, and April 9, 2015.  (Dkt. No. 1 at 4–6; Gov't Ex. 6 at 2–3.)  On two occasions, when the agents conducted field tests, the undercover purchases field-tested positive for synthetic cannabinoids.  (*Id.*)

The final events between Akram and the informant occurred on April 13 and 14, 2015.  On April 13, the informant called Akram to arrange a meeting the next day at 9:00 AM.  (Gov't

Ex. 2.)  During the call, the informant mentioned the words "four of them," and there may have been an assumption between Akram and the informant that Akram would furnish the same kind of product that he furnished on March 17, 2015.  (Dkt. No. 40 at 74.)  The next day, April 14, Akram and the informant communicated with each other by text message to follow up.  (Gov't Ex. 3.)  The meeting never occurred.  Under surveillance, Akram left the premises around 8:15 AM with a young child and a box roughly 20 inches by 20 inches in size.  Akram exited from the east side of the building.  (Dkt. No. 41 at 19.)  After dropping off the child at a school, Akram made his way to Interstate 390, presumably on his way to the meeting with the informant in Buffalo.  (Dkt. No. 40 at 29–30.)  At the request of DEA agents, New York State Police pulled over Akram on Interstate 390 around 8:46 AM and arrested him.  A canine alerted to the presence of narcotics in Akram's vehicle.  (*Id.* at 32.)  State police saw the box in the front passenger seat of Akram's vehicle, its contents visible because the box flaps were tucked down and into the box.  The box contained three clear one-gallon containers of liquid and two smaller boxes.  (*Id.*)  Yensan and New York State Police Investigator Michael Bruggman ("Bruggman") interviewed Akram at State Police barracks.  (*Id.*)

Following Akram's arrest, also on April 14, 2015, Bruggman applied to Monroe County Criminal Court for a search warrant of Akram's residence at 670 Jay Street, Apartment A1.  (Gov't Ex. 6.)  In the application, Bruggman described multiple undercover purchases from Akram's store of suspected liquid synthetic cannabinoids.  All of the purchases were forwarded to the DEA for analysis, and the results of any DEA analysis not seem to appear in the warrant application, but Bruggman twice performed field tests on undercover purchases and received positive results for the

presence of synthetic cannabinoids.  Bruggman stated in the warrant application that he consulted

Yensan about other suspected synthetic cannabinoids purchased from Akram's business and how

"[t]he evidence analyzed by the DEA laboratory similar in appearance, packaging and labeling as

the evidence purchased by the undercover Investigators during the operations documented above."

(*Id.* at 3–4.)  Bruggman included updated information about events that occurred earlier in the

day.  Bruggman mentioned Akram's arrest and how a field test yielded positive results for the

presence of synthetic cannabinoids, for the contents of the box found in the front passenger seat

of Akram's vehicle.  Additionally, Bruggman described how, earlier in the day, another Monroe

County Court judge issued a search warrant for Akram's business.  Agents executing the search

warrant for the business seized suspected synthetic cannabinoids from within the business, along

with mail in Akram's name for Apartment A1.  The agents who executed the business search

warrant also

> entered the east side door to 670 Jay St Rochester, NY and proceeded up to
> Apartment A1 where they interviewed Shahidia Husain who claimed to be the wife
> of Mohammed AKRAM and stated that he did live in the apartment with her.
> Said east side door is the only door on the east side of the building which is located
> between two fences in which one was locked by a bicycle chain.  The bicycle lock
> was the same that AKRAM was observed by surveillance personnel exiting from
> with the brown cardboard box.

(*Id.* at 4; but see Dkt. No. 41 at 41 ("Q. So you're unaware whether there is an entrance to the

building in the rear or north of the building?  A. I do not know.").)  Monroe County Court Judge

Christopher Ciaccio appears to have approved the application and issued the search warrant for

Akram's apartment.  The Court has not seen the actual search warrant that resulted from

Bruggman's application, and the record is not clear as to what might have been seized from

Akram's apartment, but the parties have not disputed that a search warrant issued and that the apartment was searched.

### C. This Case and Pending Motions

This case began with the filing of a pre-indictment complaint on April 15, 2015, the day after Akram's arrest. (Dkt. No. 1.) The complaint recites many of the details cited above. The only detail that the complaint adds is a list of items that were in fact seized from 670 Jay Street on April 14, 2015 (*Id.* at 7), though no distinction was made between items seized from Akram's business and items seized from Akram's apartment. The Government filed a three-count indictment on June 4, 2015. (Dkt. No. 13.) In Count One, the Government accuses Akram of possession with intent to distribute, and distribution of, AB-FUBINACA on December 9, 2014; in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). In Count Two, the Government accuses Akram of possession with intent to distribute, and distribution of, AB-PINACA on March 17, 2015; in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). In Count Three, the Government accuses Akram of maintaining his business, "Best in the West," as a drug-involved premises in violation of 21 U.S.C. § 856(a)(1). The indictment also contains a forfeiture notice for a sum of $67,847 U.S. currency seized on April 14, 2015 from either Akram's business or apartment.

Akram filed his omnibus pretrial motions on November 23, 2015. (Dkt. No. 24.) Since Akram seeks a variety of dispositive and non-dispositive relief in his motions, the Court will address each motion separately below.

III.     **DISCUSSION**

### A. Motion for a Bill of Particulars (Non-dispositive)

Akram seeks a Bill of Particulars that would specify, *inter alia*, exactly when and where he

allegedly possessed controlled substances and the specific manner in which he allegedly

maintained 670 Jay Street as a drug-involved premises.  The Government responds that

> This is an uncomplicated three-count indictment alleging that on December 9, 2014, the defendant distributed AB-FUBINACA (Count 1); on March 17, 2015 the defendant distributed AB-PINACA (Count 2); and between November 2014 and April 14, 2015, the defendant maintained the premises known as "Best in the West," located at 670 Jay Street, Rochester, New York, for the purpose of distributing AB-FUBINACA and AB-PINACA (Count 3).  Along with the specifics alleged in the Indictment, the government has provided, among other things, numerous DEA Form 6s (Reports of Investigation) pertaining to the conduct described above along with related relevant conduct; search warrant applications dated April 13 and 14, 2015, respectively, for "Best in the West" and for the defendant's adjoining apartment residence; several State Police reports from July 2012 and from January through April 2015 pertaining to controlled purchases conducted at "Best in the West"; photographs of substances seized on April 14, 2015; laboratory reports of the AB-FUBINACA and AB-PINACA distributed by the defendant as described above and seized from the defendant during the April 14 traffic stop; and the defendant's criminal history.

(Dkt. No. 25 at 5.)

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of

particulars in order to identify with sufficient particularity the nature of the charge pending against

him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of

double jeopardy should he be prosecuted a second time for the same offense."  *U.S. v. Bortnovsky*,

820 F.2d 572, 574 (2d Cir. 1987) (citations omitted).  "Moreover, it is of no consequence that the

requested information would have required the disclosure of evidence or the theory of the

prosecution.  While a bill of particulars is not intended, as such, as a means of learning the

government's evidence and theories, if necessary to give the defendant enough information about

8

the charge to prepare his defense, it will be required even if the effect is disclosure of evidence or of theories.  A district court judge, however, has the discretion to deny a bill of particulars if the information sought by defendant is provided in the indictment or in some acceptable alternate form." *U.S. v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (internal quotation marks and citations omitted).

Here, Akram has access to sufficient information to allow him to prepare his defense fairly. Among other items, Akram now has all of the exhibits entered into evidence at the suppression hearing, giving him notice of exactly which conversations and arrangements led to his arrest. Akram also has the pre-indictment complaint and the Monroe County Court search warrant applications, giving him notice of the exact dates of alleged undercover purchases.  Further, the Government has filed publicly several DEA Form 6a reports that summarize the prelude to Akram's arrest and the events of his arrest almost minute by minute.  (Dkt. No. 25-1.)  The available information together gives Akram ample opportunity to allow for the proper preparation of a defense, to avoid surprise at trial, and to protect them from double jeopardy.  The Court accordingly denies the request for a Bill of Particulars.

## B.  Motion for Rule 16 Information (Non-dispositive)

Akram has made a motion under Federal Rules of Criminal Procedure ("FRCP") Rule 16 for pretrial disclosures including statements; prior criminal history; documents and other tangible materials; reports including summaries of expert testimony; copies of rough notes; and any surveillance logs.  The Government responds that some of Akram's requests, such as for wiretap transcripts, are not applicable to this prosecution; that it already has provided Akram with most of the other information that he has requested; and that other information will be provided at the

appropriate time under the eventual trial order from Judge Wolford.  So long as the Government

arranges for the preservation of rough notes and remains mindful of its continuing obligations

under Rule 16, the Court finds the Government's response sufficient at this time.  The Court

denies Akram's motion as moot but without prejudice to renew before Judge Wolford if necessary.

### C.  Motion for Brady / Jencks / Giglio Information (Non-dispositive)

Akram seeks information subject to disclosure under *Brady v. Maryland*, 373 U.S. 83

(1963), the Jencks Act, 18 U.S.C. § 3500, and *Giglio v. U.S.*, 405 U.S. 150 (1972).  "[S]uppression

by the prosecution of evidence favorable to an accused upon request violates due process where

the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith

of the prosecution . . . . Society wins not only when the guilty are convicted but when criminal

trials are fair; our system of the administration of justice suffers when any accused is treated

unfairly."  *Brady*, 373 U.S. at 87.  The *Brady* rule covers situations "[w]hen the reliability of a given

witness may well be determinative of guilt or innocence."  *Giglio*, 405 U.S. at 154 (internal

quotation marks and citation omitted); *accord U.S. v. Bagley*, 473 U.S. 667, 676 (1985) (plurality

opinion) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady*

rule.") (citing *Giglio*).  When considering information that might fall under the *Brady* rule, "[t]he

question is not whether the defendant would more likely than not have received a different verdict

with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting

in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The Government

does not necessarily have to await a defense request to produce information that falls under the

*Brady* rule, but neither does it need to adopt an "open file policy."  *See id.* at 437; *see also U.S. v.*

10

*Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense.  The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation.") (citations omitted).  Also, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."  *U.S. v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted).  As for the timing of *Brady* disclosure, "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made.  Thus disclosure prior to trial is not mandated.  Indeed, *Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward . . . . At the same time, however, the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use."  *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (citations omitted).

Here, the Government has acknowledged its affirmative obligations for disclosure under *Brady*, the Jencks Act, and *Giglio*, and has committed to making disclosures within the time that Judge Wolford will set in the eventual trial order.  The Government's commitment will suffice for now, absent a showing that a different arrangement is necessary in this case.  The Court denies Akram's motion as moot but without prejudice.

### D. *Motion for Information under Various Rules of Evidence (Non-dispositive)*

Akram has made a motion for a variety of pretrial disclosures under various provisions of the Federal Rules of Evidence ("FRE"): FRE 404(b), 607, 608, 609, 702, 703, 705, and 801(d)(2)(E). FRE 404(b) governs requests for disclosure of all evidence of prior bad acts that the Government intends to use in its case-in-chief. FRE 404 requires that defendants be given "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to use at trial." To the extent that the Government intends to use any such evidence of a prior bad act in its case in chief, the Government shall produce all FRE 404(b) evidence as directed by Judge Wolford in the trial order.

With respect to Akram's requests under FRE 607, 608, 609, and 801, the only notice requirement imposed by any of those Rules applies closer to trial. FRE 609(b)(2) mandates that "the proponent [give] an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." To the extent that the Government intends to use at trial evidence falling under these rules, it must give reasonable notice as directed by Judge Wolford in the trial order.

As for expert witnesses, the Court directs the Government to remain mindful of its obligations under Rule 16(a)(1)(G) but otherwise finds that its response is sufficient.

In sum, the Court denies defendants' motion but without prejudice to renew as needed at trial or after issuance of a trial order.

### E. *Motion for Disclosure of Grand Jury Minutes (Non-dispositive)*

Akram has made a motion for review of the minutes of the grand jury proceedings. Akram has phrased his request entirely in the conditional tense—he wants "to determine whether a

motion to dismiss on prosecutorial misconduct grounds, or other grounds, is appropriate." (Dkt. No. 24 at 21.) "Parties seeking disclosure have the burden of showing that the requested material is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *In re Grand Jury Subpoena*, 72 F.3d 271, 274 (2d Cir. 1995) (citation omitted). Here, Akram's request for disclosure is too speculative. *See U.S. v. Smith*, 105 F. Supp. 3d 255, 261–62 (W.D.N.Y. 2015). The Court denies the motion accordingly.

### F.   Motion for Audibility Hearing (Non-dispositive)

Akram has made a motion for an audibility hearing for any audio evidence that the Government would use at trial. Akram has not yet identified what audio evidence might be inaudible, and the Government has committed to giving Akram an opportunity for audibility review in the time that Judge Wolford eventually sets in the trial order. The Court accordingly denies this motion but without prejudice.

### G.   Motion to Suppress Statements (Dispositive)

Akram has made a motion to suppress "any and all oral statements allegedly made by defendant , if there are any, on the following grounds: (1) the statement(s) or portions of the statement(s) were made pursuant to custodial interrogation prior to the Miranda warnings and in the absence of counsel; (2) the statements made involuntarily in violation of the defendant's Federal Constitutional rights, as well as defendant's common law rights; (3) the statements made in the absence of a valid waiver of the "Miranda" rights; and/or statements otherwise made in violation of the defendant's federal constitutional, statutory and/or common law rights." (Dkt. No. 24 at 25.) The Government responds that law enforcement agents gave Akram proper

Miranda warnings before interrogating him and that Akram made a knowing and voluntary waiver of his rights.  (*See* Dkt. No. 28-1 at 1; Dkt. No. 46 at 9.)

"Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.  If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  "Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.  The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."  *Id.* at 445.  The invocation of the right to remain silent must be unambiguous; if it is then the defendant cuts off all questioning about that offense.  *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (citation omitted).  On the other hand, defendants in a custodial interrogation who receive proper *Miranda* warnings can make a knowing and voluntary waiver of their rights.  "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  *U.S. v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citations omitted).  Courts assess the totality of the circumstances when determining the validity of a waiver. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (citations omitted).  "Circumstances that support a finding of involuntariness may include the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of

detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep." *U.S. v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (internal quotation marks and citations omitted).

Here, the information available from the suppression hearing and the parties' papers points to proper *Miranda* warnings and a knowing and voluntary waiver. The Government has not claimed to have any statements from Akram prior to the interview at State Police barracks. The Government has not contested that the interview at the barracks constituted a custodial interrogation, but the Court finds credible the information confirming that *Miranda* warnings occurred before agents asked any questions. (Dkt. No. 28-1 at 1; Dkt. No. 41 at 16.) The Court also credits the information that Akram stated affirmatively that he understood his rights. (Dkt. No. 28-1 at 1; Dkt. No. 41 at 16–17); *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."); *cf., e.g., United States v. Durham*, 556 F. Supp. 2d 141, 151 (N.D.N.Y. 2008) ("Defendant proceeded to engage in a wide-ranging discussion with [an officer], and eventually Defendant volunteered incriminating information relevant to the gun charge. Defendant does not allege that he asked for an attorney or indicated he wanted to cease the conversation at any time."). Under these circumstances, the Government has met its burden of showing that the interrogation was proper. The Court thus recommends denying Akram's motion.

### H.  Motion to Suppress Identification (Dispositive)

Akram has made a motion to suppress any identification procedures as potentially suggestive.  The Government has confirmed that identification procedures were not used during the investigation leading to this case.  Accordingly, the Court recommends denying Akram's motion as moot.

### I.  Motion to Suppress Tangible Evidence (Dispositive)

Akram has made a motion to suppress all tangible evidence obtained following his traffic stop and during the execution of the residential search warrant for 670 Jay Street.[1]  Akram believes that the law enforcement agents involved did not have authority to stop or to search his vehicle. Akram considers the search warrant for his apartment to be an excessively broad general warrant. Akram also argues that law enforcement agents had no information connecting any alleged drug activity to his apartment.  The Government responds that communications between Akram and the informant, combined with surveillance on the morning of April 15, 2015, gave law enforcement agents probable cause to stop Akram on the road for possession of synthetic cannabinoids.  As for the search warrant, the Government argues that law enforcement agents had evidence from direct surveillance that created probable cause to believe that Akram's apartment was involved in drug activity along with his business.  Alternatively, the Government asserts that the good-faith exception applies.

---

[1] Akram's omnibus motions hint at a challenge to the search of his business in addition to his apartment; the motions ask to void "the search warrant for 670 Jay Street" (Dkt. No. 24 at 28) without being more specific and refer to search warrants in the plural (*id.* at 29–30).  The Court, however, has not seen the search warrant application for the business, and Akram's more specific argument (*id.* at 30) concerns the apartment only.  The Court accordingly will proceed assuming that Akram is challenging only the search of his apartment.

"The test for probable cause is not reducible to precise definition or quantification. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence have no place in the probable-cause decision. All we have required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act. In evaluating whether the State has met this practical and common-sensical standard, we have consistently looked to the totality of the circumstances. We have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Florida v. Harris*, ___ U.S. ___, 133 S. Ct. 1050, 1055 (2013) (internal quotation and editorial marks and citations omitted). With respect to Akram's traffic stop, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted); *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (citations omitted). With respect to the search warrant for the apartment, "two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (citations omitted).

Assessing the traffic stop first, the Court sees several factors supporting probable cause to stop Akram's vehicle. Without infringing on the presumption of innocence at trial, the recorded communications indicate that Akram built up a relationship with the informant with a consistent desire to acquire both "old" and "new" formulations of synthetic cannabinoids. On April 13,

17

2015, that desire manifested itself in specific arrangements to meet in Buffalo the next day at a specific time to deliver a quantity of synthetic cannabinoids.  On April 14, 2015, Akram left 670 Jay Street—using a door that could lead either to the business or to the apartment—with a box that was consistent with the synthetic cannabinoids that he was scheduled to deliver in Buffalo just over an hour later.  *Cf. United States v. Marin*, 669 F.2d 73, 82 (2d Cir. 1982) (affirming probable cause to stop a vehicle where "data and observations would give a reasonably cautious person ample basis for believing that Marin had committed, or was committing, or was about to commit a crime").  Law enforcement agents surveilled Akram long enough to start taking a route consistent with the route that he would have needed to take to make his rendezvous with the informant.  Under these circumstances, law enforcement agents believed reasonably that there was at least a fair probability that Akram was heading directly to a meeting with the informant carrying contraband with him.  Once law enforcement agents executed the traffic stop, they obtained the additional information about the box in plain view and about the canine alert for the presence of contraband in the vehicle.  *See also United States v. Christophe*, 470 F.2d 865, 869 (2d Cir. 1972) (affirming probable cause to stop a vehicle and to search it without a warrant based on preceding communications and activity).  All of the above information together suffices to establish probable cause for the traffic stop and the vehicle search.

Sufficient information also supported probable cause for the search of Akram's apartment. The search warrant application described a number of controlled purchases from the business on the first floor of 670 Jay Street, placing explicit drug activity within the building.  On the day of Akram's arrest, law enforcement agents saw Akram leave the building from a locked and gated side

that has only one door, which gives access to the apartment on the second floor.  *Cf. United States v. Love*, No. 10-CR-6116L, 2012 WL 1684600, at *7 (W.D.N.Y. May 14, 2012) (finding probable cause to search one apartment based on observations and connections to another apartment in the same building); *United States v. Rizzo*, No. 09-CR-6016, 2009 WL 6059528, at *4 (W.D.N.Y. Sept. 12, 2009) (same), *report and recommendation adopted*, No. 09-CR-6016L, 2010 WL 1038557 (W.D.N.Y. Mar. 19, 2010).  The agents saw Akram use a certain bicycle lock on the gate that they later saw in the apartment during a voluntary interview with Akram's wife.  That the building might have other doors on other sides does not affect the agents' observation of where Akram departed.  When Akram left the building, he was carrying a box containing materials that eventually field-tested positive for synthetic cannabinoids.  Finally, when agents searched Akram's business, they did find mail there addressed to Akram at his apartment address.  Akram is right to point out that the majority of information developed during the investigation concerns the business, but probable cause required only a fair probability of finding contraband in the apartment.  The agents gave Judge Ciaccio a substantial basis to find that probability, and in any event, Judge Ciaccio's decision to issue the warrant was not so facially deficient that the agents could not rely on it in good faith.  *See, e.g., United States v. Leon*, 468 U.S. 897, 922–23 (1984); *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir.), *cert. denied*, 136 S. Ct. 433 (2015).

Under all of the above circumstances, probable cause supported both the traffic stop and the search of Akram's apartment.  The Court thus recommends denying Akram's motion to suppress.

### J.   Motion for In Camera Review of Pre-Sentence Report (Non-dispositive)

Finally, Akram has made a motion for *in camera* review of any pre-sentence report ("PSR") that might have been prepared when the confidential informant who met with him pled guilty in or around 2012. "Defense counsel has reason to believe that the PSR contains valuable impeachment evidence in that it contains statements of the government witness that may be inconsistent with prior statements of innocence that the witness(es) made to federal agents. Further, defense counsel believes that the PSR contains statements made by the government witness that are inconsistent with the government witness' prior statements to a federal agent that he has never used narcotics, which prior inconsistent statements are material and likely to affect the trier of fact." (Dkt. No. 24 at 32–33.) Since Akram's principal concern here is impeachment of a potential trial witness, the Court will defer to Judge Wolford as to how to address the issue in the eventual trial order or during other trial preparations. The Court will deny the motion for now but without prejudice to renew later if necessary.

## IV.   CONCLUSION

The Court adjudicates or makes recommendations for each of Akram's pretrial motions as explained above.

## V.   OBJECTIONS

For Akram's dispositive motions, a copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59. "As a rule, a party's failure to object to any purported

error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas*

*v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

      SO ORDERED.

                                 __/s Hugh B. Scott_____
                                 HONORABLE HUGH B. SCOTT
                                 UNITED STATES MAGISTRATE JUDGE

DATED: October 18, 2016